BENJAMIN KNOWER AND ANOTHER vs. THE CADDEN CLOTHING COMPANY.

Hartford Dist., Oct. T., 1888. PARK, C. J., CARPENTER, PARDEE, LOOMIS and BEARDSLEY, Js.

Where the title of a vendee is attacked on the ground of an intent on the part of the vendor to defraud his creditors by the transfer, it is necessary that the vendee should have had an actual belief that the vendor made the transfer with such intent.

The existence of this belief may be inferred from the circumstances, but it is not enough that the vendee had reason for the belief if he did not in fact have it.

The acts and declarations of one conspirator are admissible to affect his co-conspirators, although done or spoken in their absence, if done or spoken during the continuance of the conspiracy and in furtherance of it.

But they are not so admissible where done or made after the conspiracy has come to an end, either by the accomplishment of its purpose or by its abandonment.

It is within the province of the court to determine whether a plaintiff has introduced sufficient evidence of a conspiracy to justify the admission of evidence of such acts and declarations of the co-conspirators.

The law imputes knowledge of the acts of a conspirator, while prosecuting the purposes of the conspiracy, to his co-conspirators.

Upon questions of knowledge, good faith or intent, other transactions of the same party from which an inference respecting the quo animo may be drawn, are admissible.

[Argued December 18th, 1888—decided January 19th, 1889.]

SCIRE FÁCIAS upon a process of foreign attachment in which the defendant company was garnisheed by the plaint-

iffs as the debtor of Leopold Levy and as having his goods in its possession; brought to the Superior Court in Hartford County and tried to the jury before *Phelps, J.*

Upon the trial the plaintiffs offered evidence to prove, and claimed to have proved, that Leopold Levy, on July 1st, 1885, opened a store on the corner of Canal and Lispenard streets in the city of New York; that he was a jobber in gentlemen's and ladies' furnishing goods; that all his goods were new and of these classes; that within three months Levy purchased of the plaintiffs, merchants in the city of New York, $5,000 worth of goods, towards which he paid only $1,000; that on the 28th of September, 1885, Levy quietly fled to Europe, leaving his creditors, and among them the plaintiffs, unpaid, and never returned; that a brother-in-law, Dublon by name, about three weeks before Levy left, entered his store, apparently as an employee, and after his flight acted as manager of the store; that on Saturday, October 3d, F. J. Rosenberg, president of the Cadden Clothing Company, the defendant, was in Levy's store in private consultation with Dublon, and that on Monday morning following Dublon gave orders to the employees in the store to pack all the goods in the store, and ship all the gentlemen's furnishing goods to the Cadden Clothing Co., and all the ladies' furnishing goods to H. Goldsmith & Co., both at Hartford; that Dublon and the other employees commenced to pack and ship the goods accordingly; that they commenced to pack at 8 o'clock Monday morning and packed until 10 o'clock that night; that on Monday they shipped three cases of goods to H. Goldsmith & Co., and Tuesday five cases of goods to the Cadden Clothing Co., and the same day delivered to the New York, New Haven & Hartford Railroad Co. five other cases of goods to be forwarded to the Cadden Clothing Co., and seven other cases consigned to H. Goldsmith & Co.; that all the shipping receipts given for the goods so consigned read "received from Leopold Levy;" that these goods were invoiced to both the Cadden Clothing Company and to H. Goldsmith & Co. as having been purchased by them of Leopold Levy, and were so entered upon Levy's sales books; that when the

cases of goods were placed upon the sidewalk for transportation they were turned down, so that the names of the consignees were concealed from view, and this by the orders of Dublon; that Dublon and the other employees worked from 8 o'clock in the morning until late at night Tuesday packing and shipping these goods; that toward evening, October 6th, one of the plaintiffs' employees entered Levy's store, and that the bookkeeper was then making out the invoices to the Cadden Clothing Co. and to H. Goldsmith & Co.; that thereupon Dublon ordered the bookkeeper to hide the invoices so that the plaintiffs' employee might not see them, and that this was accordingly done; that Tuesday evening the plaintiffs discovered that all the goods in Levy's store were being shipped away, and on Wednesday morning caused an attachment to be placed on the goods remaining in the store, and also the goods in the hands of the common carrier in New York; that when the sheriff took possession of Levy's store Wednesday morning there were four cases in the store packed and ready for shipment, addressed to H. Goldsmith & Co., Hartford, and that there was remaining to be packed and shipped only about $600 worth of goods, which, but for the attachment, would have been packed and shipped to H. Goldsmith & Co.; that Monday morning, when Dublon began to pack and ship, there were between $6,000 and $7,000 worth of goods in the store at the original cost price; that Wednesday evening, October 7th, Cassidy, an employee of the plaintiffs, came to Hartford for the purpose of attaching the goods which had been shipped to the Cadden Clothing Co. and H. Goldsmith & Co., and which had been received by them; that a writ of attachment was accordingly procured in behalf of the plaintiffs on the following morning, October 8th, against Levy, in which the Cadden Clothing Co. and H. Goldsmith & Co. were named as garnishees, and placed in the hands of an officer for service; that Goldsmith & Co. received three cases of the goods and the invoice of the same, also the invoice of the remaining cases consigned to them by Levy and stopped by the plaintiffs in New York, but that they never ordered the

goods, never purchased them, had no knowledge of them, and knew no reason why the goods should have been shipped to them, and disclaimed all interest or title in the goods, and that this was not denied by the defendant; that Cadden, the secretary and treasurer of the defendant company and its manager, in the presence of F. J. Rosenberg, the president of the company, denied to the officer that the Cadden Clothing Co. had received any goods from New York, and afterwards, in the presence of the officer, Cassidy, and plaintiffs' counsel, repeated such denial, until confronted by the shipping receipt book of Levy and other proof, when he admitted that he had received five cases of goods from New York, but said that he bought them of one Z. L. Furstner, who kept a gentlemen's furnishing goods house at No. 496, Broadway, New York; that Cassidy at once told him that he was acquainted with all the houses in that trade in New York city and the names of all merchants in the city in that line of trade, and that there was no such house at No. 496 Broadway, and no man by the name of Furstner in New York city in that business; that then Cadden admitted that Furstner was not in the business of furnishing goods, but said he was a diamond merchant; that thereupon a representative of the plaintiffs asked Cadden if the defendant had paid for the goods, and he answered No; that Cadden was then told that the plaintiffs would factorize the defendant, whereupon he told the plaintiffs' representative that he had paid $400 on the goods, and upon being asked when and to whom he paid, he said early that morning and to Rosenberg, the president of the defendant company; that he was then asked if Furstner had authorized him to pay Rosenberg, and he answered No; but that Rosenberg and Furstner were brothers-in-law and he knew it would be all right, and at any rate would take the risk; that he was asked if he would point out the goods which he had received to the officers, and that he said he could not because they were mixed in with his other goods.

The plaintiffs further offered evidence to prove, and claimed to have proved, that the goods invoiced to the

defendant and to Goldsmith & Co. were invoiced at the original cost price to Levy, and in some instances were invoiced at a much lower price than Levy paid for them, and in all cases for from fifteen to twenty-five per cent. less than wholesale cost price; that Rosenberg was with Dublon at Taylor's Hotel in Jersey City, Wednesday afternoon, October 7th, at about 4 o'clock; that on Saturday, October 10th, Dublon and Levy's family left for Europe, and on the 16th Rosenberg left for Europe and met Levy in Paris; that neither Dublon nor Levy have since returned to this country; that neither the Cadden Clothing Co., Rosenberg, Furstner, nor any other person in behalf of either, made any demand of the plaintiffs, or of the sheriff making the attachment, for the goods attached in New York, and that the shipment of the goods to the defendant, as well as those shipped to Goldsmith & Co., was for the purpose of concealing them from attachment by Levy's creditors and in fraud of such creditors, with the full knowledge of the defendant and by collusion of the defendant and its executive officers with Levy and Dublon.

The defendant then offered in evidence the by-laws of its company, and claimed from them that Cadden, who was its secretary and treasurer but who was not a stockholder, had sole power to purchase goods for and manage the affairs of the defendant, and that Rosenberg, the president of the company, had no power to purchase goods or act for the corporation. The defendant also offered evidence to prove that Rosenberg had been the holder of a note signed by Leopold Levy for $1,650, which he had transferred to Z. L. Furstner of New York city for a loan, which note became due October 3d, 1885; that Rosenberg had paid Furstner before October 3d, and then held the Levy note; that Rosenberg, acting for Furstner, having been told by Dublon that there was no money to pay the note, offered to Dublon to take goods in payment of the note; that Dublon consented, and that Rosenberg thereupon requested him to pack and ship the goods to the Cadden Clothing Co.; that Rosenberg on the 5th of October wrote Cadden that Furst-

ner had a line of furnishing goods which Furstner represented to be a good assortment, and that he had told Furstner he could ship them to the defendant at wholesale cost price; that the five cases of goods received by the defendant arrived Wednesday morning, October 7th, and were taken into the defendant's store; that Wednesday night Rosenberg came to Hartford, and that about 7 o'clock the following morning he happened into the defendant's store, and that Cadden voluntarily paid Rosenberg for Furstner $1,000 in money and gave him a check for $800, in full payment of the goods already arrived and of those which the plaintiffs had stopped in New York; and that such payment was made before the service of the process of foreign attachment.

It was admitted that at the time the process of foreign attachment was served on the defendant, Rosenberg was present in the defendant's store, and it was admitted by the defendant that when the alleged payment was made to Rosenberg, Cadden had not examined the goods which had arrived, and that his conduct in paying for these goods without first having examined them and before a considerable portion of them had arrived, was unusual and contrary to his business habit. The amount of the invoice was $1,802.45.

Evidence was offered by the defendant that the goods which had been shipped by Dublon to Goldsmith & Co. were shipped pursuant to a scheme between Rosenberg, Dublon, and Victor & Achilis, without Goldsmith's knowledge, in order that Victor & Achilis, New York creditors of Levy, might come to Connecticut and attach them, and that the purpose of Rosenberg's coming to Hartford the night of October 7th was to procure an attachment of the goods for Victor & Achilis, and that although the goods sent to Goldsmith were sent pursuant to such a scheme, the goods sent to this defendant were shipped in good faith for value and without fraudulent knowledge or intent on the part of the defendant.

The plaintiffs claimed upon the evidence before the jury

that the pretended note of $1,650 was not genuine, and claimed from Rosenberg's own evidence that if it were genuine it was not owned by Furstner at its maturity, and that the defendant's claim that the goods were purchased by Furstner in payment of the note was not and could not be true. Rosenberg testified that before the note became due he had paid Furstner the loan for which he claimed to have given him the note as collateral, and that Furstner neither owned nor had possession of the note at its maturity.

The plaintiffs further claimed from the evidence that Furstner was an imaginary person, and was so known to be both to Rosenberg and to Cadden, and that the name was used by Rosenberg and Cadden to conceal the real transaction between Dublon, Levy, and the defendant.

The plaintiffs further claimed from the evidence and the circumstances that the defendant never paid Rosenberg for the goods, and that if it had in good faith purchased the goods and paid for them, as it claimed to have done, the defendant would have demanded a return of the goods which the plaintiffs had attached in New York and which the defendant has never received.

The defendant claimed that Rosenberg was not acting for the company in any of his transactions with Dublon, but was acting solely for himself and Furstner, and that there was nothing fraudulent or illegal in those transactions, but that it was only a case of one creditor endeavoring to obtain payment before other creditors, which was not illegal; but that if there was any illegality connected with the transactions between Rosenberg and Dublon, the defendant had no knowledge of it through any person acting for it or authorized to act for it, and that no knowledge of Rosenberg or of any one but Cadden was binding upon or affected it in these transactions.

The plaintiffs, on the trial, offered as their first witness one Cassidy, a salesman in their employment, and in the course of his testimony, and after he had stated that he was frequently in Levy's store, inquired of him when he discovered they were clearing out Levy's store? The counsel

for the defense objected to evidence of what the witness saw in New York unless it was shown to have been known by the defendant at the time; which objection was sustained by the court. The counsel for the plaintiffs then claimed that they should in their subsequent testimony make it admissible by proper connection, and under that claim it was admitted. The answer to the question was—"On the evening of October 6th."

Isaac M. Levy was also offered as a witness by the plaintiffs, and the same question was put to, and the same answer given by him, subject to the same objection by the defendant's counsel, and admitted under the same claim.

At a later stage in his testimony the same witness was inquired of by the plaintiffs' counsel with reference to the packing and shipping under orders from Dublon, of other goods in Levy's store to Goldsmith & Co., to which the counsel for the defense objected, but it was admitted under the claim and on the ground that the acts and conduct of Dublon, from his connection with Levy and Rosenberg with reference to the goods in question, tended to prove a fraudulent conspiracy against the creditors of Levy, among whom were the plaintiffs, to which the defendant was a party, or of which it had knowledge, or reasonable means of knowledge, and of which it was reasonably put on suspicion and inquiry.

And a similar objection by the defendant, and a similiar ruling, were made with reference to acts and declarations of Dublon showing, or tending to show, that he was keeping away from New York to avoid being summoned by the plaintiffs to testify with reference to the transactions concerning Levy's goods.

The plaintiffs also offered as a witness Herman Goldsmith, one of the firm of Goldsmith & Co. of Hartford, and to prove fraud by Levy in the disposition of his goods, and a design to put them beyond the reach of his creditors, inquired of him about the sending by him of a part of them to Goldsmith & Co. without previous purchase or order, and without consideration, to which the counsel for the defense objected; but the testimony was admitted on the ground

that, with other evidence in the case, it tended to prove the fraudulent conspiracy claimed by the plaintiffs, and that the defendants participated in or had knowledge of it.

At the close of the plaintiffs' testimony in chief, the defendant's counsel renewed the objection they had previously made, to the admission of all the foregoing testimony, on the ground that the facts testified to were not so brought to the knowledge of the defendant as to furnish evidence tending to prove it guilty of participation in a fraudulent conspiracy to prevent the creditors of Levy from collecting their debt through an attachment of the goods.

Taking into consideration the family and business relationship and connection of Levy, Rosenberg and Dublon, and their conduct with reference to the removal of Levy's goods from his store, and in other respects, the court held the evidence admissible as tending to establish against the defendant the claim of fraudulent conspiracy made by the plaintiffs, and of knowledge or means of knowledge by them of the fraud.

The request of the defendant for instructions to the jury, and the charge of the court, are sufficiently stated in the opinion.

The jury returned a verdict for the plaintiffs, and the defendant appealed.

*C. E. Perkins*, for the appellant.

1. The court erred in instructing the jury that it would vitiate the title of the defendant company to the goods, " if it was aware of such *suspicious circumstances* with respect to the goods as would reasonably put it on inquiry and *lead it to suspect there was something fraudulent and wrong* in connection with the transfer of them." This precise question has not arisen in this state, but the statement of the law as made by the judge is inconsistent with all our decisions on the subject, which hold that it is a question of *actual fraud* on the part of the grantee ; that is, of his concurrence or participation in the fraud, or of actual knowledge of it and desire to promote it. *Utley* v. *Smith*, 24

Knower *v.* Cadden Clothing Co.

Conn., 290; *Partelo* v. *Harris*, 26 id., 480; *Sisson* v. *Roath*, 30 id., 15; *Quinebaug Bank* v. *Brewster*, id., 559; *Bloodgood* v. *Beecher*, 35 id., 469; *Hawes* v. *Mooney*, 39 id., 37; *Pease* v. *Bridge*, 49 id., 58; *Bassett* v. *McKenna*, 52 id., 437; 1 Swift Dig., 266. In all the many cases on this subject in this state, we believe there is not one which does not require actual knowledge and participation in the fraud on the part of the grantee as necessary to avoid a sale, or that intimates in any way that knowledge of facts which the jury may think *ought* to have made him suspicious, or neglect to make inquiries which *might* have given him knowledge, have been held sufficient. The question has lately arisen in Massachusetts and has been decided in accordance with this view. *Carroll* v. *Hayward*, 124 Mass., 120, 122. Also in New York. *Parker* v. *Conner*, 93 N. York, 118, 112. And in New Hampshire. *Leavy* v. *Dearborn*, 19 N. Hamp., 351, 360. And the decisions of the U. S. Supreme Court agree with those of this state, that there must be *actual* participation in the fraudulent intent of the grantor to defeat the title of the grantee. *Clements* v. *Moore*, 6 Wall., 299, 312; *Horback* v. *Hill*, 112 U. S. R., 148. There are some states in the south and west that have held differently, but many of the courts in those states decide in accordance with the view we are urging. *Moore* v. *Hinnant*, 89 N. Car., 455; *Brown* v. *Foree*, 7 B. Monp., 357, 359; *Holmes* v. *Braidwood*, 82 Misso., 610; *Curtis* v. *Valiton*, 3 Mont., 153; *Coolidge* v. *Heneky*, 11 Or., 327.

2. The plaintiffs claimed that Rosenberg was the president of the defendant corporation, and that if he had knowledge of fraudulent intent on the part of Levy or his agent Dublon, the company was affected with his knowledge. But the defendant showed that Cadden was its general agent and manager, and that Rosenberg as president had no power to make purchases for the company. But the court charged the jury that "if he performed acts not previously authorized, which were subsequently assented to and adopted by the defendants, they were binding on the defendants." We submit that these instructions were erroneous, and mate-

rial. It is well settled that a ratification of the act of an agent does not bind the principal unless made with a full knowledge of all the material facts. 1 Parsons on Cont., 47, note *u; Seeley* v. *North,* 16 Conn., 97. It is doubtless true that by the ratification of the acts of an agent in making a contract the principal is bound by tortious acts done by the agent, so far as they were directly connected with the contract, and were injurious to the person with whom the agent dealt. *Morehouse* v. *Northrop,* 33 Conn., 380. But where the only question is as to the *intent* of the purchaser, or his knowledge of a fraud in the vendor, and its bearing upon third persons, a mere ratification of the *purchase,* without any knowledge of the fraud, does not affect the purchaser with the knowledge of the agent.

3. The court also erred in admitting the evidence of Cassidy, Levy and Goldsmith as to the transactions in New York without showing the defendant's knowledge of them. The court says, in *Partelo* v. *Harris,* before cited, that "it is not safe, nor in harmony with the laws of evidence, to allow counsel to press upon a jury the fraud of one man to make out fraud in another, *without some proof of conspiracy or collusion being first introduced.*" The judge recognized this as the law, for he ruled that the evidence was inadmissible, unless the defendant "had knowledge or reasonable means of knowledge, and was reasonably put on suspicion or inquiry." But we submit that the grounds upon which the judge says he admitted the evidence fall far short of "conspiracy or collusion." All he says is this : "Taking into consideration the family and business relationship and connection of Levy, Rosenberg, and Dublon, and their conduct with reference to the removal of Levy's goods from his store and in other respects," the evidence was admissible. Now there is not a suggestion in the case that there was any relationship between Rosenberg and either Levy or Dublon, nor that there was or ever had been any business relationship between them, except that Rosenberg had a note of Levy's, and even that did not appear from the plaintiffs' evidence, but from the defendant's. The judge seems to have con-

sidered that the mere fact that he was nominally the president of the defendant corporation made his knowledge, if he had any, of a fraudulent intent of Dublon, the knowledge of the corporation.

*A. F. Eggleston,* for the appellees.

1. The court was right in charging the jury that suspicious circumstances which would reasonably put the defendant on inquiry and lead it to suspect that there was something fraudulent in connection with the transfer, would vitiate its title. It is a well settled rule that when a vendee is aware of suspicious circumstances attending the sale, which should put a reasonable man on inquiry, he is bound to inquire ; and if he fails to do so, he is chargeable with the same knowledge which such inquiry would have yielded ; in other words, with knowledge of the facts. In *Stoughton* v. *Pasco,* 5 Conn., 447, the court said : "One head of presumptive notice is this, that the law imputes to the purchaser the knowledge of a fact, of which the exercise of common prudence and ordinary diligence must have apprised him." In *Partelo* v. *Harris,* 26 Conn., 482, the court said : "If, indeed, the grantee has knowledge of the fraud of the grantor, or of the *indicia* of his fraud, it will be safe and proper to hold him responsible accordingly, and let the jury pass upon the evidence." In *Post* v. *Clark,* 35 Conn., 342, the court said : "Full and adequate means of knowledge are equivalent to knowledge itself under ordinary circumstances." See also *Luckey* v. *Roberts,* 25 Conn., 492; *Lynch* v. *Hall,* 41 id., 238, 242; Wade on Notice, §§ 18, 23, 88. In *Whitbread* v. *Jordan,* 1 Younge & Coll., (Exch.,) 303, Baron ALDERSON, said : "When a party having knowledge of such facts as would lead any honest man using ordinary caution, to make further inquiries, does not make, but on the contrary studiously avoids making, such obvious inquiries, he must be taken to have notice of those facts, which, if he had used ordinary diligence, he would readily have ascertained." Cadden having been placed in the position he was, before the sale was

consummated, the defendant is clearly bound by his acts and conduct.

2. The court properly admitted evidence with reference to the packing and shipping of goods to Goldsmith & Co. under orders from Dublon. The plaintiffs claimed that a conspiracy existed between Dublon, Levy and the defendant, to defraud Levy's creditors. And it is well established law that in such cases other fraudulent transactions of a like nature, copartners with the transaction in question, are admissible in evidence. *Eells* v. *Day*, 4 Conn., 100; *Thompson* v. *Rose*, 16 id., 79; *State* v. *Spalding*, 19 id., 237; *Luckey* v. *Roberts*, 25 id., 491; *Hoxie* v. *Home Ins. Co.*, 32 id., 37; *Edwards* v. *Warner*, 35 id., 519; *Benham* v. *Cary*, 11 Wend., 83.

3. The acts of Dublon, in keeping away from New York to avoid being summoned by the plaintiffs to testify, and his declarations on the subject were admissible in evidence as the acts of a co-conspirator while pursuing the object of the conspiracy. When a combination is once established such acts and declarations of any one of the conspirators, although done and made in the absence of the others, are admissible against them all. *Cowles* v. *Coe*, 21 Conn., 234; *State* v. *Shields*, 45 id., 263. See also the cases cited under the next preceding head. And it is for the court that is trying the case to determine whether there has been sufficient proof of a conspiracy to make evidence of such acts and declarations of the co-conspirators admissible against the rest. *Cowles* v. *Coe*, above cited.

4. The court properly charged that "if Rosenberg performed acts not previously authorized, which were subsequently assented to and adopted by the defendant, they were binding on the defendant." This is correct law. *Toll Bridge Co.* v. *Betsworth*, 30 Conn., 390, 391; *Perry* v. *Simpson Waterproof Manf. Co.*, 37 id., 534. The portion of the charge above quoted the defendant complains of, because the court did not say, in so many words, that any assent or adoption by the directors, to be binding upon the defendant, must be made with full knowledge of all the material facts in the

case. But this question of knowledge or notice, the court did take into account, and repeatedly alluded to it in his charge to the jury, saying to them that the defendant would not be made liable, unless some officer or agent, authorized to act for it in the transaction, had knowledge of the fraud.

PARDEE, J. It was the claim of the plaintiffs that Leopold Levy was their debtor, and that with the intent to defraud his creditors he transferred a portion of his personal property to the defendant, the Cadden Clothing Company, a corporation, through the agency of F. J. Rosenberg, its president, which received and retained possession of the property, having either actual knowledge or reasonable means of knowledge that the transfer by Levy was with such fraudulent intent.

The defendant claimed that Rosenberg, as an individual, was a creditor of Levy ; that the property was delivered by Levy to Rosenberg in payment: and that the latter, as an individual, sold it to the defendant.

The court instructed the jury that " to vitiate the defendant's title to the goods on the ground of fraud, it should appear that it was not a *bonâ fide* purchaser of them, and did not receive them in good faith, and that it either had a part in or knowledge of the fraud of Levy, or Rosenberg, or Furstner, if they, or either of them, were guilty of any in the transaction ; or that it was aware of such suspicious circumstances with respect to the goods as would reasonably put it on inquiry, and lead it to suspect that there was something fraudulent and wrong in connection with the transfer of them.

· " Fraud is a poisonous element in any transaction, and if proved destroys any sale of property, or other contract contaminated with it. If Levy, being the owner of the goods, or any one else by his direction or for him, with intent to defraud his creditors, sent the goods to the defendant, and the defendant having knowledge or reasonable means of knowledge of the purpose to defraud, received them, the transfer was fraudulent, and no title passed to the defendant. The

goods would still be Levy's, and liable to be taken for his debts."

Also that the "acts and declarations of an officer of a corporation must, to bind the corporation, be done and made while actually engaged in the performance of his official duty; but the knowledge of the directors and other managing officers of a corporation is generally the knowledge of the corporation when it relates to its interest and business; and the acts and declarations of Dublou and others, if mere employees and not agents of Levy, are not binding on the defendant, unless known to the defendant at the time, or afterward adopted by it, or by Rosenberg, or Cadden, or both, while acting in the performance of their duties as agents or managing officers of the defendant."

The plaintiffs had a verdict. The defendant appealed for the following reasons:

1. That the court erred in refusing to charge the jury as requested by the defendant upon each of its six requests.

2. That the court erred in charging the jury in relation to the question of fraud, and especially in charging that knowledge of any fraud of Rosenberg or Furstner, would vitiate a sale to the defendant, and that knowledge of any suspicious circumstances with respect to the goods which would reasonably put the defendant on inquiry and lead it to suspect that there was something fraudulent and wrong in connection with the transfer of them, would have the same effect.

3. Also in charging that if the defendant with knowledge, or reasonable means of knowledge, of the purpose to defraud, received them, no title passed to the defendant.

4. In relation to the adoption of Rosenberg's acts by the directors, the court should have charged that any assent or adoption by the directors to be binding upon the defendant must be made with full knowledge of all the material facts in the case.

5. The court erred in instructing the jury that if Cadden or Rosenberg had knowledge of circumstances which would reasonably lead them to believe or fairly suspect

fraud in the transfer, their verdict should be for the plaintiffs.

6. The whole charge of the judge on the question of fraud was erroneous, besides the particulars above specified.

7. The judge also erred in admitting the evidence of Cassidy, Levy and Goldsmith, as set out in the finding, as there is nothing in the plaintiffs' evidence as set out in the finding to authorize the admission of the same.

8. The court erred in admitting the evidence of Isaac M. Levy relating to orders from Dublon to pack and send goods to Goldsmith & Co.; also in admitting evidence of the acts and declarations of Dublon showing that he was keeping away from New York; also in admitting the evidence of Herman Goldsmith as to the goods sent him; also the evidence of A. W. Cassidy in relation to what he discovered in New York; all as set out in the finding.

In *Utley* v. *Smith*, 24 Conn., 290, the claim being that certain conveyances of real estate were fraudulent and void under the statute, as having been made with a view of insolvency, the court held that in order to make them so the grantor must not only in fact be in failing circumstances, but must make the deed with a view to insolvency, and with intent to prefer one creditor over another, saying that the true rule is that the *quo animo* is the important and decisive characteristic.

In *Sisson* v. *Roath*, 30 Conn., 15, it was determined that although a conveyance was made with an intent to defraud creditors, yet if the grantee did not participate in the fraud, the conveyance is good.

In *Quinebaug Bank* v. *Brewster*, 30 Conn., 559, the marginal note is as follows : " The court below found that a certain mortgage was given with a view to insolvency if the evidence was to be weighed by the ordinary rules of evidence, without giving to any of it an additional legal or constructive effect ; but that if the parties to the mortgage were to be held chargeable with the knowledge of the facts of which they had such notice as would lead a prudent man, in a

matter which concerned his pecuniary interest, to make inquiry, and were to be presumed to have intended the probable consequences of giving such mortgage, in view of the facts which might have been ascertained by such inquiry, then the mortgage was found to have been given in view of insolvency. It was held that the latter rule could not be applied, and that the mortgage was to be regarded as not given in view of insolvency." The court said: "Facts which by inquiry he might have ascertained, if in truth he did not know them or believe in their existence, could have had no influence upon his purposes or his actions. And notice enough of his actual condition to put him upon inquiry, if that inquiry had not been made, could have had no influence upon his actions. Legal fictions and equitable presumptions have no effect upon the actual conduct of men. An omission to inquire may be evidence of negligence, but negligence is not fraud, either in law or fact, and neither proves nor indicates a positive intention to commit a fraud, whatever penal consequences the law-giver in his wisdom may attach to such negligence."

In *Bloodgood* v. *Beecher*, 35 Conn., 469, the court, speaking of a similar question and approving of the foregoing case, adds that the *quo animo* must be proved as a fact and cannot be inferred or presumed to exist by inference of law contrary to the fact.

In *Hawes* v. *Mooney*, 39 Conn., 37, a conveyance was declared void because of actual fraud participated in by the grantee.

In *Bassett* v. *McKenna*, 52 Conn., 437, the court held a conveyance of land void because the grantee knowingly assisted in placing it beyond the reach of attachment.

In *Luckey* v. *Roberts*, 25 Conn., 486, the plaintiff claimed that the defendant had received goods from his brother with knowledge that the transfer was made with the intent on the part of the vendor to defraud his creditors. The defendant claimed that he bought the goods in good faith, without notice of any fraudulent intent on the part of the vendor in selling them to him. The court charged the jury that if

Knower v. Cadden Clothing Co.

"the defendant made the purchase * * * knowing, or having sufficient reason to believe, that the goods were not paid for, and that it was then the intention of William E. Roberts to abscond and defraud his creditors by means of such sale to the defendant, then the defendant's purchase was, as against the plaintiff, fraudulent and void, and the defendant could not hold the goods." In this court, the defendant's complaint concerning this part of the charge was, that the "court erred in charging the jury that if the defendant knew that the goods were not paid for and that William E. Roberts (the vendor) intended to abscond and defraud his creditors, he could not hold the goods. All this is consistent with a purchase originally *bonâ fide*, and which vested the title fully in the purchaser. An intention to defraud creditors generally would make the defendant's purchase simply void as against creditors who, by attaching the goods as the property of the defendant's vendor, could take them from him ; but it would give the plaintiff no right to rescind the original sale nor to claim the property from the defendant, but only to attach and hold it as the property of William E. Roberts on the ground that he was a creditor of said William. *Owen* v. *Dixon*, 17 Conn., 492." The plaintiff claimed that the "purchase of the goods by the defendant from William E. Roberts was clearly a fraud on the plaintiff and therefore void as to him, if the defendant knew that said William had not paid for the goods and made the sale intending to defraud his creditors thereby." In commenting upon this part of the charge this court said :—"It is said that this ruling is inconsistent with the law laid down by this court in *Owen* v. *Dixon*, 17 Conn., 492, that a fraudulent sale by the owner of goods does not give a title to the goods to a creditor, and that he can get a title only by sale on execution. * * * The defendant here was insisting that he was a *bonâ fide* purchaser from his brother William, not that the plaintiff had no title if he had been defrauded, as he claimed he had, but that the defendant had purchased the goods honestly and therefore at all events he had acquired a good title. The court in this part of the charge intended to

state, and we think did state, what was essential to constitute a *bonâ fide* purchase by the defendant."

From these extracts it is quite plain that there was no claim on the part of the plaintiff that the defendant's title would be defective if he had sufficient reason for believing, in the absence of actual belief, that his vendor had a fraudulent intent in the transfer. This court was not required either to accept or deny that particular proposition, and is not to be understood as having done either in that case.

In *Partelo* v. *Harris*, 26 Conn., 480, the plaintiff had been in possession of personal property delivered to him by one Otis, in payment of a debt. The defendants, creditors of Otis, attached the property so delivered by him to the plaintiff as the property still of Otis, claiming that the transfer had been made by him for the purpose of defrauding his creditors, and in performance of a fraudulent combination for that purpose between him and the plaintiff. The creditors offered to prove that Otis, while in possession of the property and before sale to the plaintiff, had declared his intention to transfer the property for the purpose of preventing an attachment by his creditors. This declaration, not being known to the plaintiff, was rejected by the court. For this the defendant moved for a new trial, and in support thereof claimed that " to establish the fact of the fraudulent conveyance it was necessary to prove—1st, that the grantor made it with the intent and for the purpose of defrauding his creditors; 2d, that the grantee knew of this purpose, participated in it, and by his concurrence promoted it." The plaintiff's claim was " that to furnish any presumption against the subsequent grantee, he must have knowledge of the fraud." The court, after remarking that a grantee ought not to be affected by the declarations of a grantor unless they come to his knowledge, adds :—" If indeed the grantee has knowledge of the fraud of the grantor, or of the *indicia* of his fraud, it will be safe and proper to hold him responsible accordingly, and let the jury pass upon the evidence ; but otherwise it should not be submitted to them, as it is not safe, nor in harmony with the laws of evi-

dence, to allow counsel to press upon a jury the fraud of one man to make out fraud in another, without some proof of conspiracy or collusion being first introduced." Inasmuch as the question whether good reasons for believing, in the absence of actual belief, will vitiate a purchase from a vendor who has a fraudulent intent, was not in the case, and inasmuch as the court remarks later that, " at all events, the great and necessary fact to be established is the fraud of the grantee whose title is attacked for fraud of his own, without which no case of fraudulent conveyance is proved, and with which a case is proved and established, the court must be understood as saying no more than that, after the creditors had sufficiently established the existence of a fraudulent conspiracy and collusion between vendor and vendee, then declarations made by the vendor, during the existence of the conspiracy, even in the absence of the vendee, might be used against the latter. This is made still more evident by the reason given for the quoted remark, that " it is not safe, nor in harmony with the laws of evidence to allow counsel to press upon a jury the fraud of one man to make out fraud in another without some proof of conspiracy and collusion being first introduced."

We have made these references to the decisions of this court for the purpose of showing that in all cases where the title of a vendee has been attacked because of the intent on the part of the vendor to defraud his creditors by the transfer, those making the attack have been required to assume the burden of proving that the vendee had actual knowledge of and participated in the fraud; that is, that he had an intent to commit a fraud; this to be proven as a fact and not to be imputed by any rule of law. The relations existing between the vendor and vendee, business, social, or family; the opportunities open to the latter for knowing the condition, conduct and intent of the former; the capacity of the vendee to determine motives from actions—are all facts for the jury, and from such they may reach the conclusion that he actually believed that the vendor intended fraud, and was a conspirator with him. Indeed, from such facts and

in such manner a fraudulent intent must always be proven; no person can know the unexpressed thought of another. *Carroll* v. *Hayward*, 124 Mass., 120; *Leavy* v. *Dearborn*, 19 N. Hamp., 351; *Parker* v. *Conner*, 93 N. York, 118.

Notwithstanding the defendant's objection the plaintiffs were allowed to prove that Levy was sending goods from the store to Goldsmith & Co., at about the same time, without previous orders from them; and that this agent declared that he was keeping out of the reach of a summons from the plaintiffs to testify in this case.

In *Hoxie* v. *Home Insurance Co.*, 32 Conn., 37, this court said as follows:—" Upon questions of knowledge, good faith or intent, any other transactions from which any inference respecting the *quo animo* may be drawn are admissible. And when fraud is imputed and within the issue, and provable by various circumstances, a considerable latitude must be indulged in the admission of evidence. * * * It has sometimes been thought that the other transactions should be cotemporaneous, or nearly so, but that is not essential. A fraudulent combination and fraudulent motive may be inferable from a series of successive transactions of a fraudulent or suspicious character and in respect to such a subject-matter. In this case, if there had been a considerable number of vessels cotemporaneously purchased, mortgaged, insured heavily, both vessel and freight, and both by owner and mortgagee, and lost suspiciously in moderate weather, some inference of fraudulent combination and intent as to all would be unavoidable. But a series of similar transactions effected in the same way by the same parties with the same result, would excite the same suspicion and induce the same inference." This justifies the admission of the evidence as to the sending of goods to Goldsmith & Co. The conspiracy having been established, the rule of law admits proof of the acts and declarations of one conspirator to affect his co-conspirators, although done or spoken in the absence of the latter, if done or spoken during and in furtherance of the conspiracy. That having come to an end because either of the accomplishment or the abandonment

Knower v. Cadden Clothing Co.

of the purpose for which it was formed, the conspirators become individuals again, and cease to be affected by what is said or done in their absence. Therefore the declarations of Dublon, made after the dissolution of the conspiracy, were not admissible as against the defendant.

At the close of the plaintiffs' testimony in chief, the defendant's counsel renewed the objection they had previously made, to the admission of all or any of that testimony, on the ground that the facts testified to were not so brought to the knowledge of the defendant as to furnish evidence tending to prove that it was guilty of participation in a fraud or fraudulent conspiracy to prevent the creditors of Levy from collecting their debt through an attachment of the goods. Taking into consideration the family and business relationship and connection of Levy, Rosenberg, and Dublon, and their conduct with reference to the removal of Levy's goods from his store, and in other respects, the court held that the evidence was admissible as tending to establish against the defendant the claim of fraud and fraudulent conspiracy made by the plaintiffs, and of knowledge or means of knowledge by them of such fraud and fraudulent conspiracy. It was within the province of the court to determine that the plaintiffs had introduced sufficient evidence of a conspiracy to justify the reception of evidence concerning acts and declarations of each conspirator, done and spoken during and in furtherance of the conspiracy, to affect co-conspirators, although done or spoken in the absence of the latter.

The testimony of Cassidy, to the effect that on a day named Levy was clearing his store of goods, was admissible as tending to prove that the latter was then furthering the purpose of the conspiracy. The law imparts knowledge of his acts to his co-conspirators.

There is error in the judgment, and a new trial is granted.

In this opinion the other judges concurred.